CARAWAY, J.
bThe defendant appeals an adverse judgment granting the plaintiff a preliminary injunction. The dispute arose a year after the plaintiff began construction along a public reservoir of a seawall, which is now 90-95% complete. While the defendant granted the plaintiff a permit to construct the seawall, it argues that the permit only granted plaintiff one year to complete the seawall. Additionally, the defendant argues that the seawall was placed in an improper location on defendant’s property. After the issuance of the permit for the seawall, as construction began, the parties also executed a boundary agreement that sets forth a boundary line pertaining to the seawall. The defendant, a political subdivision of the state, challenged the boundary agreement and the trial court’s granting of a preliminary injunction. We agree with the trial court’s ruling and affirm the plaintiffs preliminary injunction.

Facts

As developed in the hearing for the preliminary injunction, the facts concern a permit for a seawall and boundary dispute, uniquely situated along a public reservoir. The plaintiff, Longleaf Investments, L.L.C. (hereinafter “Longleaf’), is a lake lot owner with land located on Cypress Lake which is owned and regulated by defendant, Cypress Black Bayou Recreation & Water Conservation District (hereinafter “the District”). The District is a political subdivision with powers addressed in La. R.S. 38:2601, et seq.
|aOn July 7, 1969, the Department of Public Works recorded right of way maps of the Proposed Bayou Cypress Reservoir (hereinafter the “Lake Plat”). The Lake Plat set forth and described the following surveyed lines around the proposed reservoir in relation to mean sea level (“MSL”) elevations:
179.6 M.S.L. Contour-Top of irrigation and municipal water supply pool;
Fee Line (Greater of 2 feet vertically or 100 feet horizontally above the 179.6 contour);
Easement Line (187.5 M.S.L. Contour).
Other than the above quoted language on the Lake Plat describing the three boundary lines (hereinafter the “Contour Line,” the “Fee Line,” and the “Easement Line,” respectively), the Lake Plat gave no explanation for these lines.
On July 31, 1969, several land owners, the predecessors-in-title to Longleaf, conveyed to the District a large tract of land “lying below the fee line” as depicted on the previously recorded Lake Plat. This conveyance included the land adjacent to the lake bed now in dispute. Cypress Lake was thereafter created.
The District has adopted and maintained its “Official Policy and Regulations” (hereinafter the “Regulations”), for the public use of Cypress Lake. The Regulations also identify and address the purpose of the three surveyed lines identified on the Lake Plat. Regarding the 187.5 MSL Easement Line, the Regulations state:
In order to provide for periodic floods which may inundate areas above spillway elevation 179.6 MSL, the District has acquired a |sflowage easement up to the (flowage easement line) elevation of 187.5 feet MSL. Section II, Rule 10(a).
In addressing the Fee Line and the Contour Line, and the use of the land between these lines, the Regulations state:
In order that private land owners may have the use of this property as a means of access to the lake surface, a lease may be issued by the District to adjacent property owners when the terms, fees, conditions, and restrictions established are agreed to in writing. Section III, Rule 2(a).
*507 Private lot owners ... owning or having acquired lease on property adjacent to the “in fee line” and planning to locate or located on such property above the “in fee line” may be issued leases on the area down to the water level on payment of prescribed fees therefore, and providing such private lot owners ... agree to abide by the rules and regulations governing such lease or permit covering District property. Section III, Rule 4(a).
In order to provide a public access strip around the periphery of Cypress Bayou Reservón’, the District has acquired land areas above the pool stage (179.6 MSL) to the (in-fee line) which is generally the greater of two feet vertically or one hundred feet horizontally above the 179.6 MSL contour line. Section II, Rule 9(b).
Accordingly, we will hereinafter refer to the area of land between the Fee Line and the Contour Line as the Access Strip, and it is this boundary area along Cypress Lake that is the focus of this dispute.
Additionally, the District has many other rules and provisions within the Regulations, that may have a bearing upon this dispute. We have reviewed all of the Regulations involved.[1]
*508 IsLongleaf purchased the property at issue (hereinafter the “Longleaf Tract”) on January 19, 2006. Longleaf is owned by James Young, a real estate appraiser, and his wife. The Longleaf Tract is a peninsula surrounded on the north, west, and south by Cypress Lake. The 2006 Long-leaf deed made reference to the 1969 deed and conveyed a portion of the land retained along the Fee Line by the vendors to the 1969 conveyance. Thus, the boundary between Longleafs and the District’s properties in 2006 remained the Fee Line.
In 2010, Longleaf decided to develop its property and create a subdivision. Due to erosion around the Longleaf Tract, Young was not clear on the boundaries with regard to Cypress Lake. Longleafs survey- or and chief engineer, Joey French, was therefore tasked with establishing the boundary line and constructing a seawall around the Longleaf Tract in order to prevent further erosion. Accordingly, *509 Young and French met with Bruce Easterly, the District’s professional engineer and land surveyor, to begin this process. The parties walked the shoreline, noted the erosion, and according to French, discussed “reestablishing where the contour was prior to the erosion, where it was in 1969 when the property was transferred.” Easterly testified that he informed them of the District’s Regulations regarding a permit for the construction along the lake.
| (jAfter meeting with Easterly, French surveyed the Longleaf Tract in order to relocate the 1969 179.6 MSL Contour Line. While erosion made it difficult to ascertain the original shoreline and water’s edge, French’s best reconstruction plotted the course for the 1969 179.6 MSL Contour Line along the current 177 MSL Contour Line. French outlined the existing 177 MSL contour line in a rough plat that he attached to the District’s permit application and noted that Longleafs proposed seawall would be built at the 177 MSL. The plat did not, however, specifically express his determination that the present 177 MSL was the approximate location of the 1969 179.6 MSL Contour Line.
On December 14, 2010, Longleaf was granted a permit (hereinafter the “Permit”) to construct a seawall around their tract. The Permit was written on a District form, authorizing Longleaf as follows:
To: Build a seawall
Build a retaining wall at 179.6 MSL on Cypress Reservoir and 185.0 MSL on Black Bayou Reservoir not to exceed 22 inches in height and 21 inches in backfill. Taking care not to alter the original shoreline or change the original waters edge at 179.6 MSL of Cypress Reservoir and 179.6 MSL on Black Bayou Reservoir.
In the event that any work other than that listed above is performed, the necessary permit will be obtained from Cypress Black Bayou Recreation & Water Conservation District PRIOR to construction.
After receiving the Permit, French testified that he marked posts with pin flags, as Easterly requested, along the course he planned to construct the base of the seawall, at approximately the 177 MSL. French stated that these posts were driven to a depth of 4 feet with 2 to 2-1/2 feet exposed 17aboveground. Easterly denied making the post request and instead testified to only informing French and Young of the District’s Fee Line and Easement Line. French testified that he constructed the seawall so that the top of the seawall would tie in with the top of a neighboring landowner’s seawall, located at 180 MSL. French testified that Easterly said as long as fill material behind the seawall “has an insignificant impact on the lake it shouldn’t be any problem.” Construction on the seawall began in March of 2011.
Coinciding with the initial construction efforts, Longleaf also began trying to obtain a boundary agreement which Longleaf submitted to the District. An April 27, 2011 letter was prepared by Dickie Walden, the District’s executive director at that time, to advise that the District’s lawyer had reviewed the proposed boundary agreement and that more information, such as surveys and maps, were needed. This letter, however, was apparently never received by Young or Longleaf. Nevertheless, Ralph Whitley, a District Board member, told French to bring the boundary agreement to the District’s August meeting of the Board.
At the conclusion of the August meeting of the District’s Board, on August 24, 2011, Longleaf and the District, by act of its newly elected President, Michael Webber, executed a boundary agreement (hereinafter the “Boundary Agreement”). The pur *510 pose of the Boundary Agreement was described as follows:
4.
There are on file in the official public records of Bossier Parish documents and plats that identify the original acquisition boundary contour of Cypress Black Bayou Reservoir which has changed due to |8erosion. This document is to permanently affix the original contour of the boundary line separating the properties of PARTY ONE, described above, from that of PARTY TWO, described above.
5.
In order to permanently fix the location of the boundary line contour separating the property of PARTY ONE, described above, from that of the property of PARTY TWO, described above, all parties hereto stipulate and agree that the attached “Boundary Agreement Line Description,” be adopted as the boundary line contour separating the said properties.
6.
PARTY ONE waives, relinquishes and quitclaims to PARTY TWO any and all rights to any portion of the property identified in the plat referenced above as the property of PARTY TWO and PARTY TWO waives, relinquishes and quitclaims to PARTY ONE any and all rights to any portion of the property identified in the plat referenced above as the property of PARTY ONE.
French testified that a metes and bounds survey (hereinafter the “Seawall Survey”) was identified in paragraph 5 as the “Boundary Agreement Line Description” and attached to the Boundary Agreement at the time that it was executed. The Seawall Survey contained 44 calls for distance and direction. French testified that the 44 calls corresponded to the posts that he placed in order to construct the seawall. The Seawall Survey, therefore, contains a more detailed description of the seawall’s location than the plat attached to Longleafs permit application. While French testified that the Seawall Survey was attached when the Boundary Agreement was signed, these written survey calls were not recorded in the conveyance records along with the Boundary Agreement. Instead, only a “Map of Survey” roughly depicting the Longleaf Tract and the Seawall Survey course was attached.
1 nWith other Board members serving as witnesses, the District’s President Webber executed the Boundary Agreement on the District’s behalf. Webber testified that he did not know what exactly was contained in or attached to the Boundary Agreement.
After the Boundary Agreement was signed, Longleaf put up the following sign in various locations on the top its seawall:
NOTICE
Private Property
No Trespassing
Do not tie off to seawall
As construction of the seawall continued into 2012, neighboring landowners complained about the location of Longleafs seawall and the amount of fill material being placed on the bed of Cypress Reservoir. These complaints were voiced at the District meeting in March 2012. The District investigated the matter.
On April 6, 2012, the District, through its legal counsel, sent a cease and desist letter to Longleaf informing them of their error in building the seawall. The District’s letter stated:
Because we believe that the property within the retaining wall is property below the Fee Line that is owned by the District, it appears that Longleaf is attempting to claim the District’s property as its own, is filling in the District’s property with soil and may eventually *511 plan to sell lots including the District’s property for construction of homes.
As you may be aware, not only is the property below the “Fee Line” on Cypress Lake owned by the District, there is also a flowage easement to an elevation of 187.5 feet MSL. Longleafs activities in placing fill material upon the district and upon Longleafs property interferes with the flowage easement.
Longleafs activities have not been authorized by the District. The District hereby demands that Longleaf cease and desist from any |10and all activities in adding any fill material within the aforesaid wood retaining wall and adding any fill material or making any construction in the area affected by the flowage easement.
Thereafter, an informal meeting was held with Young, French, Longleafs attorney, the District’s new executive director, Kevin Jeter, and several District commissioners to discuss the situation. Although the seawall was 90 to 95% complete, the District informed Longleaf that it would only be satisfied by the removal of the seawall.
Longleaf halted their construction on the seawall and filed a petition on May 17, 2012. The petition requests a preliminary injunction, permanent injunction, and a declaratory judgment recognizing that the Boundary Agreement is valid and effective between the parties. The defendant answered by denying the plaintiffs allegations and filing a reconventional demand that challenged the validity of the Boundary Agreement and requested a judgment ordering Longleaf to remove their seawall.
After a preliminary injunction hearing and the receipt of the above evidence, the trial court issued its opinion on August 3, 2012. The trial court’s opinion thoroughly reviewed the testimony of the witnesses and concluded:
At this point of the litigation, it appears to the Court that Longleaf has legitimately attempted to comply with everything that the District required it to do. Longleaf has relied to its detriment on the authority, or apparent authority, of the District to grant a permit and enter into a boundary agreement relinquishing its rights to the property landward of Longleafs seawall. The wall appears to be in the same location as other seawalls on the lake and does not appear to alter the shoreline or change the original water’s edge ... Irreparable injury is not a requisite item of proof to obtain a preliminary injunction in cases involving an obligation not to do. The relief requested by Longleaf is a preliminary injunction requiring the District not to do that which it 1 nhas, by issuing the permit and executing the boundary agreement, agreed not to do.
After the trial court’s ruling, the parties failed to agree as to the wording and activity by the District meant to be restrained in the preliminary injunction. The trial court held an additional hearing to clarify its position and stated that it “allowed the plaintiff to proceed and [it] restrained the District from interfering with the construction of the seawall.” The trial court added “construction of’ to its judgment and then signed the following:
A preliminary injunction shall issue enjoining the District from interfering with construction of the seawall which has been partially constructed by Long-leaf.
The District filed this appeal challenging Longleafs preliminary injunction.

Discussion

A preliminary injunction is an interlocutory procedural device designed to preserve the existing status quo pending a *512 full trial on the merits. State ex rel. Caldwell v. Town of Jonesboro, 47,896 (La.App.2d Cir.12/19/12), 108 So.3d 217, writ denied, 18-0173 (La.1/23/13), 105 So.3d 60; Louisiana Granite Yard, Inc. v. LA Granite Countertops, L.L.C., 45,482 (La.App.2d Cir.8/18/10), 47 So.3d 573, writ denied, 10-2354 (La.12/10/10), 51 So.3d 733; Louisiana Gaming Corp. v. Rob’s Mini-Mart, Inc., 27,920 (La.App.2d Cir.1/24/96), 666 So.2d 1268, 1270. An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law. La. C.C.P. art. 3601(A). An applicant for a preliminary injunction has the burden of making a prima facie showing that he will prevail on the [12merits of the case, i.e., that he will obtain a permanent injunction based upon proof of irreparable injury. White v. St. Elizabeth B.C. Bd. of Directors, 45,213 (La.App.2d Cir.6/2/10), 37 So.3d 1139.
All of the District’s assertions of error on appeal pertain to the procedural requisites for injunctive relief, including the necessity for a prima facie showing of plaintiffs claim and irreparable injury. The substantive claim by Longleaf as expressed in its petition and prayer for relief is “[f]or a declaratory judgment that its Boundary Agreement is enforceable and its permit to construct its wall is valid and in force.” From the record, the “boundary” dispute underlying this action is most unique. In fact, the title instruments establishing the lake and separating the adjoining ownerships of the District and lake lot owners indicate that the “boundary” involves more than just the so-called “fee line,” but also possible use rights extending across the land from the Fee Line to the Contour Line. It is that area of land, the Access Strip, that must be reviewed for an understanding of Longleafs substantive claim and the District’s assertions regarding the judgment for injunctive relief.
Viewed solely from the initial Lake Plat and the original 1969 deed to the District, the evidence within the conveyance records reveals that the division of ownership separating the adjoining tracts was along the line designated as the Fee Line. The Fee Line was located at least 100 feet beyond the Contour Line making the Access Strip at least that wide. Therefore, from these early documents creating the disputed boundary between the District and Longleafs predecessors-in-title, the Longleaf Tract |13did not extend to the expected pool stage of the lake which would be the water level at the spillway elevation of 179.6 MSL. Likewise, the 1969 deed to the District does not address in any manner, other than by an unclear implication, that Longleafs predecessors could gain access to the lake from their property by crossing the Access Strip to reach the water line. In the same manner, the 1969 deed does not discuss the purpose of the Easement Line or make the property retained by Longleafs predecessors above the Fee Line subject to any high water servitude in favor of the District.[2]
This gap in the meaning for the Contour Line and Easement Line from the parish conveyance records is purportedly filled for the governance of the parties’ adjoining ownerships by the District’s Regulations. Nevertheless, from our review of the Regulations, the regime of lakeshore use addressed in the Regulations is far from clear. First, while the Regulations allow *513 the adjoining lot owner possibly to obtain a “lease” of the Access Strip “as a means of access to the lake surface,” the Regulations do not further define this “lease” and its term or set forth clearly in the Regulations’ schedule for lake fees a rental for this lease right. Not surprisingly, the record does not disclose whether Longleaf or its predecessors-in-title ever entered a “lease” agreement with the District. Second, the Regulations discuss soil erosion along the shore in Section III, Rule 8(f) and appear to impose a duty upon each adjoining lot owner, as “lessee,” “to adequately maintain the leased area” or Access Strip from the |udamage of erosion. Nevertheless, the Regulations never specifically address a permit procedure for the construction of a seawall by the adjoining lot owner/lessee.
Despite these issues, Longleafs claim is that it has been granted a right to construct the seawall at a location running along the Contour Line. Before any consideration of the Boundary Agreement, Longleafs prima facie case first rests on the December 2010 Permit. The District’s Permit form identifies the original 1969 shoreline at the 179.6 MSL elevation. The Permit was granted to Longleaf to build a seawall at the 179.6 MSL. French interpreted the District’s use of 179.6 MSL as the line on the ground that coincided with the Contour Line of 1969. Because of erosion the actual MSL today along the location of the Contour Line is lower. Therefore, from French’s own admission, locating the geographic line of the 1969 Contour Line must involve a reconstruction and estimate of the former shoreline.
The Permit as quoted above indicated that a seawall could be constructed at the 1969 Contour Line. It allows for fill material to be placed behind the wall. The rough sketch on French’s plat submitted with the application for the Permit does show a red line identified as the “Proposed Wall = 177 +/-.” The trial court could accept French’s testimony that he had advised Easterly that he proposed to reestablish where the 1969 Contour Line was geographically located. From this evidence, because erosion had obviously occurred over 40 years, French’s interpretation and determination of the Contour Line along an elevation less than 179.6 MSL appears reasonable and his construction of the wall along this reconstructed Contour |1sLine was arguably within the authority granted by the Permit. The District’s lack of any presentation at the hearing of conflicting data from an on-the-ground survey allowed the trial court to accept Longleafs prima facie claim.
French’s later Seawall Survey is his determination of the geographic location of the former 179.6 MSL elevation, or the Contour Line. Longleafs submission of this proposed location for the seawall was contained in the August 2011 Boundary Agreement. Regardless of any error affecting the District’s consent to the Boundary Agreement which is the subject of its reconventional claim, the trial court could accept the execution of the Boundary Agreement as a further prima facie showing of Longleafs right to continue construction along the line set forth in the Seawall Survey. To that extent, the Boundary Agreement is at least a clarification and further extension of the Permit allowing for construction to continue for at least another year. Again, there is no clear permitting procedure specifically addressing seawall construction within the Regulations and no one-year limitation was set forth on the Permit. We find disingenuous the District’s attempt to enforce a one-year restraint with its ill-defined process for building a seawall, a task which the Regulations attempt to impose on the lake lot owners. Accordingly, we find that Longleaf did establish a prima facie case *514 for a District-authorized construction of a seawall along the Seawall Survey line.
Regarding the validity and effect of the Boundary Agreement as a transfer of the District’s ownership of the Access Strip to Longleaf, the | ^merits of that controversy framed by the District’s reconventional demand await trial on the merits upon remand. Regardless of the outcome of that matter, a declaratory judgment of the ownership and extent of use rights of the parties also appears warranted for this Access Strip made a justiciable controversy in part by certain inadequacies in the title documents and Regulations noted above.
Next, the subject matter underlying this dispute involves a declaratory judgment action for the ownership, use and possession of immovable property. La. C.C.P. art. 3654. This includes the alleged extrajudicial Boundary Agreement which may convey ownership to each party along the designated line. La. C.C. art. 789 and its Revision Comment (c). Therefore, under Article 3663 of the Code of Civil Procedure and the jurisprudence interpreting the allowance for injunctive relief in real actions, a preliminary injunction brought pursuant to Article 3663 does not require a showing of irreparable harm. La. C.C.P. art. 3663; Cason v. Chesapeake Operating, 47,084 (La.App.2d Cir.4/11/12), 920 So.3d 436, writ denied, 12-1290 (La.9/28/12), 98 So.3d 840; Monroe Real Estate & Dev. Co. v. Sunshine Equip. Co., 35,555 (La.App.2d Cir.1/23/02), 805 So.2d 1200.
Finally, the District questions the particularity of the language of the injunction concerning the acts sought to be restrained. La. C.C.P. art. 3605. It is clear from that language and the post-trial proceeding over the scope of injunction that Longleaf was allowed to proceed with finishing the seawall and the District was restrained from taking any action regarding the wall during the pendency of the action. Longleafs allowance to finish the wall [17required its posting of a $75,000 bond. The District asserts that since it had never taken action to interfere with the seawall, the judgment is impermissibly vague.
We reject this attack on the injunction. The allowance for Longleafs finishing of the seawall was not contested timely by supervisory review and may be considered moot. Moreover, Longleafs bond allows protection for the District in the event it prevails on the merits. Likewise, while the District had taken no prior action on the property affecting the seawall, the trial court’s injunctive relief was appropriate to maintain the status quo of the use and occupancy of the controversial Access Strip, including the seawall.
Accordingly, the preliminary injunction is affirmed, and the case is remanded to the trial court for further proceedings. Costs of this appeal are assessed to the District in the amount of $147.50, pursuant to La. R.S. 13:5112.
PRELIMINARY INJUNCTION AFFIRMED; REMANDED.

. The following Regulations touch on matters involved in this dispute:
Section II, Rule 3(a): The policy is herein established that no property owned by the District will be available for private, public or commercial use, so long as such property is required for present or future District uses or purposes.
Section II, Rule 4(a): The policy is herein established that no property owned by the District will be disposed of by sale or transfer of title at any time, unless such property is determined by the Board of Commissioners to be "surplus” and unnecessary to use by the District. In such event, property deemed surplus shall be offered for sale by public sale in accordance with Louisiana Law.
Section II, Rule 8(a): The policies herein established that every effort will be made to retain the natural scenic beauty of the shoreline of the reservoirs. Destruction of trees, shrubs, and natural vegetative screening will be discouraged and where clearing operation on District owned lands are authorized, appropriate measures will be taken to insure proper maintenance and care of the area so cleared in order that the Natural scenic appearance of shoreline is not degraded. Restraint should be exercised toward reduction and destruction of vegetative screening.
Section II, Rule 11(a): It shall be the policy of the District that the contiguous landowner or District Concessionaire in the recreation area, may use the area below the 179.6 foot or "pool stage,” provided that all rules and regulations, prescribed fees, restrictions, and reservations, including waiver of any claims against District for damages, are agreed to by lessee, or concessionaire, in writing. Any landowner who is proposing construction of a boathouse, pier, wharf or deck, and its location begins on the landowner's property and extends into the property of Cypress Black Bayou Recreation and Water Conservation District, must submit to the commission the following information before the commission can consider granting permission for such construction:
⅜ ⅜ ⅜ ⅜ ⅞: ‡
(e) Boathouses, docks, wharves, and piers or any other such facility may be constructed below the fee line only after written permission is given by the Cypress Black Bayou Recreation and Water Conservation District commission. This permission is at the commission's discretion.
Section II, Rule 12(a): It shall be the policy of the District that the adjacent property owners or District concessionaire may have the right to lease the area between the "in fee line” and the pool stage contour line (179.6 MSL) providing that all rules and regulations, prescribed fees, restrictions and reservations, including waiver of any claims against District for damages, are agreed to by owner and concessionaire in writing. Boathouses, docks, wharves and piers and/or any other construction may be permitted below the fee line ONLY when written permission has been given by the District. The general public shall have the right of ingress and egress to, from and along the water front over leased area, but this right does not include the right *508 to utilize authorized private structures and facilities placed thereon by LESSEE. Applications for "leases” and/or "permits” shall be made on application forms obtained at the Cypress Black Bayou Recreation and Water Conservation District office at Benton, Louisiana, 135 Cypress Park Drive, Benton, Louisiana 71006.
Section III, Rule 5(a): All owners or lessees of land around Cypress Bayou Reservoir abutting the District "in fee line” including private, individual, business, commercial organization and developers of Real Estate Subdivision, who do desire to alter, change or realign the Cypress Black Bayou Reservoir water line in District property by channeling, digging, scraping or moving of earth, in order to bring the water level closer to their property line and/or to deepen such channel for boating, water in takes, etc. must file application and a copy of plans with the District and obtain approval by permit prior to doing any work of this type. If additional lands are flooded or become subject to flooding, the owner must first deed to the Cypress Black Bayou Recreation and Water Conservation District a simple title to said lands to be flooded and an additional 100 feet horizontal or 2 feet vertical, whichever is greater, landward in all directions.
Section III, Rule 5(b): When it has been determined by the District that such plans are in order, approval will be given and upon payment of any prescribed fees, a permit will be issued to private individual, business, commercial and/or organization property owner or lessee. Work authorized under the permit must be completed with a period of 12 months from date of permit and must be accomplished in accordance with the plans approved by the District.
Section III, Rule 6(a): Lease agreements may be entered into with certain landowners of property abutting District owned property. These “lease” agreements will state: "The parties hereto agree that in executing this lease, District in nowise surrenders any right in the property herein leased necessary in the construction, operation, maintenance or financing of said project or directly or indirectly connected therewith. It does not invest in LESSEE any right or privilege inconsistent with such rights.”
Section III, Rule 8(f): The parties hereto recognize that in the public interest the lake must be fully protected against contamination of any kind, and against hazardous and unsafe installations or constructions contrary to building, safety and sanitary requirements now existing or hereafter adopted by the District. The parties hereto further recognize that situation caused by soil erosion is the most frequent type of pollution and lessee agrees to take every precaution and action to control soil erosion. The parties hereto further recognize the desirability of maintaining the pleasant and natural appearance of the shoreline and lessee agrees to adequately maintain the leased area so as not to detract from the scenic beauty of same.
Section III, Rule 8(h): It is agreed by the parties hereto that the general public is to have the right of ingress and egress to, from and along the water front over the leased area and the LESSEE shall erect no fences without the written consent of the District. On receiving written permission of the District for construction of a fence or fences, adequate gates or stiles will be installed to permit unimpeded public passage along the shoreline. This does not include the right to utilize the authorized private structures and facilities placed thereon by LESSEE.

. It is puzzling why these 1969 instruments creating Cypress Lake never address the purpose of the Contour Line and Easement Line and define the real rights of access and use that may pertain thereto. It suggests that not all recorded instruments relating to the platting of the lake may be present in the record of this suit.